

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

CHRISTOPHER SCOTT EMMETT,
    Plaintiff,

    v.

GENE M. JOHNSON, Director,

Commonwealth of Virginia Department of
Corrections; GEORGE M. HINKLE,
Warden, Greensville Correctional Center;
LORETTA K.KELLY, Warden, Sussex I
State Prison; and JOHN DOES 1-100,
    Defendants.

Case No. 3:07CV227

COMPLAINT FOR
EQUITABLE AND INJUNCTIVE
RELIEF UNDER 42 U.S.C. § 1983

EXPEDITED REVIEW
REQUESTED
EXECUTION DATE: June 13, 2007

## COMPLAINT

### I. PRELIMINARY STATEMENT

1.  Plaintiff Christopher Scott Emmett is a prisoner sentenced to death by the

    Commonwealth of Virginia. By statute, Virginia employs two methods of execution.

    lethal injection and electrocution. "The method of execution shall be chosen by the

    prisoner. In the event the prisoner refuses to make a choice at least fifteen days prior to

    the scheduled execution, the method of execution shall be by lethal injection. Execution

    by lethal injection shall be permitted in accordance with procedures developed by the

    Department [of Corrections]." Va. Code § 53.1-234.

2.  The Defendants have designed a procedure for carrying out lethal injection that purports

    to induce death only after a condemned prisoner has been rendered unconscious and

1

unable to experience pain. In reality, the policies and practices devised by the
Defendants unnecessarily risk conscious suffering and pain during execution.

3. Many of the facts concerning Virginia's lethal injection policies and practices have been
developed as a result of extensive discovery in another Virginia case, *Walker v. Johnson*,
1:05cv934 (E.D. Va.). Plaintiff expects to rely largely upon evidence obtained in *Walker*
in order to expedite this case.[1]

4. Plaintiff's complaint is similar to complaints that have been filed recently in other
jurisdictions. Within the past half year, federal courts in at least seven states have found
that allegations like those presented here raise serious Eighth Amendment concerns that
require further inquiry or modification of the lethal injection procedures before the state
can carry out the prisoner's execution. In at least two other states, governors have
suspended executions and ordered reviews of the protocols related to lethal injection.

5. In California, a federal district court found the allegations in Michael Morales' § 1983
complaint to be sufficiently troubling that it ruled on February 14, 2006, that the state
could go forward with Morales' then-imminent execution only if it added one of two
protective modifications to its lethal injection procedures. *Morales v. Hickman*, 415
F.Supp.2d 1037 (N.D. Cal. 2006). The state was unable to make one of the modifications
and unwilling to make the other. As a result, the district court stayed Morales' execution,
and contentious litigation on the merits is now going forward.[2]

---

[1] The § 1983 trial in *Walker* originally was scheduled for June 12, 2006. Shortly before that date
both parties filed motions for summary judgment. Walker's motion for summary judgment is an
exhibit to the instant complaint. Exhibit A (with attached Exhibits 1-23).

[2] Information about the *Morales* litigation, including the factual basis for the prisoner's challenge

6.    In Missouri, Michael Taylor initially was unable to fully litigate the merits of his

challenge to the state's procedures for lethal injection.  The Eighth Circuit, recognizing

the seriousness of Taylor's allegations, granted a stay of his then-imminent execution to

permit him further opportunity to litigate his claim, and the Supreme Court upheld that

stay.  *See Taylor v. Crawford*, 445 F.3d 1095 (8th Cir. 2006) (reciting procedural

history).  After discovery and a full hearing, the district court ruled in Taylor's favor.

*Taylor v. Crawford*, 2006 WL 1779035 (W.D. Mo. Jun. 26, 2006).  In *Taylor v.*

*Crawford*, 457 F.3d 902, (8th Cir. 2006), the court of appeals again remanded the case to

enable the district court to determine whether Missouri's proposed new procedures pass

constitutional muster.  On September 12, 2006, the district court ruled that they did not.

*Taylor v. Crawford*, No. 05-4173-CV-C-FJG (W.D. Mo. Sept. 12, 2006), Exhibit J.  The

state's appeal of the district court's September 12, 2006, ruling was argued in the court of

appeals on January 10, 2007, and is pending.

7.    In *Evans v. Saar*, No. 06cv149 (D. Md.), a bench trial was conducted in September of

2006 on the prisoner's challenge to Maryland's procedures for lethal injection.  On

December 19, 2006, the Maryland Court of Appeals ruled that the state had not complied

with the Administrative Procedures Act in adopting its lethal injection procedures.

Hence, all executions are on hold until those procedures for reviewing such changes to

the law have been followed, or the legislature exempts the protocols from this Act.

*Evans v. State*, 914 A.2d 25, 34 (Md. 2006)

———————————————

to California's procedures for lethal injection, can be found in the Brief of Amicus Curiae

Habeas Corpus Resource, 2006 WL 558287 (Mar. 6, 2006), in *Hill v. McDonough*, 126 S. Ct.

8. In North Carolina, the federal district court found that the allegations in Willie Brown's § 1983 complaint raised issues of serious concern, and ruled on April 7, 2006, that the state could not carry out Brown's imminent execution unless it modified its procedures in a particular manner. *Brown v. Beck*, 5:06-CT-3018 (W.D. N.C. 2006) (unpublished), Exhibit B. The state proposed a substitute modification, which the district court found acceptable. Brown was executed as scheduled on April 20, 2006, under the modified procedure. Since Brown's execution, however, at least three inmates have received stays of execution from the County of Wake Superior Court following a ruling by the North Carolina Medical Board that ethically prohibited physicians from participating in executions. *Robinson et al. v. Beck*, No 07 CVS 001109 (Jan. 25, 2007), Exhibit K; *State v. Holman*, No. 97-CRS-49226 (Mar. 6, 2007), Exhibit L.

9. In Arkansas, lethal injection litigation is proceeding on the merits of Terrick Nooner's § 1983 complaint in *Nooner v. Norris*, No. 5:06cv00110 (E.D. Ark.). In an unpublished order issued June 19, 2006, the district court denied the defendants' motion to dismiss the complaint for failure to state a claim on which relief could be granted, Exhibit C, and on June 26, 2006, it granted intervenor Don Davis' motion for a preliminary injunction, Exhibit D.

10. In Oklahoma, Glenn Anderson's § 1983 challenge to the lethal injection procedures is pending in federal court. The district court denied the defendants' motion to dismiss the complaint. *Anderson v. Evans*, 2006 WL 83093 (W.D. Okla. Jan. 11, 2006).

---

2096 (2006).

4

11. In Delaware, the district court initially granted Robert Jackson a stay of execution pending the Supreme Court's decision in *Hill*, which it said would be dispositive of the court's jurisdiction. *Jackson v. Taylor*, 2006 WL 1237044 (D. Del. May 9, 2006) (unpublished). Following the decision in *Hill*, which made clear that the district court had jurisdiction over the § 1983 complaint, the parties have been litigating the merits of the challenge to Delaware's lethal injection procedures.

12. In *In re Readoption with Amendments of Death Penalty*, 842 A.2d 207 (N.J. Super. 2004), the state court halted all executions pending a resolution of issues pertaining to the adequacy of the state's regulations for lethal injection.

13. In Florida, on December 15, 2006, following the problematic lethal injection of Angel Diaz, Governor Jeb Bush issued Executive Order 06-260, creating a Governor's Commission on Administration of Lethal Injection to review Florida's lethal injection protocols and to make findings and recommendations to revise those protocols, and suspending the signing of any death warrants until those protocols were revised in accordance with the Commission's recommendations. Exhibit M. Upon information and belief, Diaz's execution took approximately 34 minutes and he was reportedly moving and mouthing words after the first set of drugs had been administered. On March 1, 2007, the Governor's Commission issued its report, recommending extensive changes to the lethal injection protocol, including modifications to policies pertaining to documentation of execution procedures, preparation of chemicals, establishing intravenous access, administration of chemicals, and selection and training of execution personnel. Exhibit N.

5

14. In Tennessee, on February 1, 2007, finding "deficiencies in the written procedures intended to ensure that all legal executions will continue to be carried out properly," Governor Phil Bredesen  issued an Executive Order staying all executions (four had been scheduled) in order to allow time for a review of the state's lethal injection procedures. Exhibit O.  The Order also directs the Commissioner of Correction to establish and provide new protocols and related written procedures related to administering death sentences in Tennessee.  *Id.*

15. In Virginia, there are five current or former § 1983 cases in which prisoners challenged the Commonwealth's procedures for lethal injection.3  The first was *Reid v. Johnson*, 333 F.Supp.2d 543 (E.D. Va. 2004), in which the district court denied James Reid's application for a preliminary injunction, and further litigation was mooted by the prisoner's execution.  In *Vinson v. Johnson*, No. 3:06cv230, the district court issued an unpublished order in which it denied Dexter Vinson's application for a preliminary injunction and summarily granted the defendants' motion to dismiss the complaint, relying heavily on its earlier decision in *Reid*.  Exhibit E.  In both *Reid* and *Vinson*, the court based its decision in part on grounds that the Supreme Court has since rejected in *Hill v. McDonough*, 126 S.Ct. 2096 (2006).[4]  In *Lenz v. Johnson*, __ F.Supp 2d __, 2006 WL 2079379 (E.D. Va. July 25, 2006), the district court denied a stay of execution on

3 A sixth inmate, John Yancey Schmitt, voluntarily withdrew a § 1983 complaint prior to any ruling by the district court and was executed on November 9, 2006.

[4] In *Vinson*, the district court also gave substantive weight to the Fourth Circuit's affirmance of its decision in *Reid*.  Although a majority of the panel in *Reid v. Johnson*, No. 4-25 (4th Cir. Sept. 8, 2004) (unpublished), Exhibit F, affirmed the district court's judgment denying a preliminary injunction, the court of appeals' summary order expressed no opinion regarding the

equitable grounds because Michael Lenz did not file a § 1983 complaint until three weeks after his execution date had been set and barely a month before his scheduled execution. In *Walton v. Johnson*, No. 2:06cv258 (E.D. Va.), the district court dismissed Percy Walton's complaint for failure to exhaust administrative remedies. Finally, the district court recently granted the Defendants' motion for summary judgment in Darick Walker's § 1983 challenge to Virginia's lethal injection procedures. *Walker v. Johnson*, 448 F. Supp. 2d 719 (E.D. Va. 2006). By order dated November 13, 2006, Walker's appeal to the Fourth Circuit was stayed pending the resolution of district court proceedings related to Walker's petition for a writ of habeas corpus.

### III.  NATURE OF ACTION

16. This action is brought pursuant to 42 U.S.C. § 1983 for violations, threatened violations, or anticipated violations of Plaintiff's right to be free from cruel and usual punishment guaranteed by the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

17. This suit does not challenge the fact of Plaintiff's conviction or death sentence, nor does it challenge the constitutionality of Virginia's statute providing for execution by lethal injection or electrocution.  Plaintiff's action, if successful, would not necessarily prevent the Commonwealth from executing him.  Plaintiff seeks only to enjoin the Defendants from executing him in a manner that causes a foreseeable risk of gratuitous and unnecessary pain.  Plaintiff concedes that the Defendants could modify their procedures

---

district court's reasoning.

in ways that would make them constitutional. No Virginia statute or regulation requires the Defendants to use the current challenged procedures.

## IV.  THE PARTIES

18. Plaintiff Christopher Scott Emmett is a United States citizen and a resident of the Commonwealth of Virginia. He is currently a death-sentenced inmate in the custody of Defendants and under the control and supervision of the Commonwealth of Virginia Department of Corrections. His Department of Corrections (DOC) Number is 300193. On Monday, April 16, 2007, the Circuit Court for the City of Danville ordered that Plaintiff be executed on June 13, 2006. Plaintiff is presently being held at Sussex I State Prison. Some time before his execution, he will be transferred to Greensville State Prison.

19. Defendant Gene M. Johnson is the Director of the Commonwealth of Virginia Department of Corrections, 6900 Atmore Drive, Richmond, VA 23225; phone (804) 674-3000.

20. Defendant George M. Hinkle is the Warden at Greensville Correctional Center, 901 Corrections Way, Jarratt, VA 23870-9614; phone (434) 535-7000. Greensville Correctional Center is the facility at which Defendants plan to carry out Plaintiff's execution.

21. Defendant Loretta K. Kelly is the Warden at Sussex I State Prison, 24414 Musselwhite Drive, Waverly, Virginia, 23891-1111, phone (804) 834-4000. Sussex I State Prison is the facility where Plaintiff currently is incarcerated.

22. Defendants John Does 1-100 are corrections officers, pharmacists, physicians, medical personnel, executioners, and other unknown individuals who are employed by, have a contractual relationship with, or perform appointed or voluntary work for the Commonwealth of Virginia Department of Corrections. They will participate in Plaintiff's execution by virtue of their roles in designing, implementing, and/or carrying out the lethal injection process. Plaintiff does not know, and it is Plaintiff's understanding that the Defendants will not reveal, the identities of these persons. When Plaintiff discovers any John Doe's true identity, he will amend his complaint accordingly unless the Court directs him not to do so.

## V.  JURISDICTION AND VENUE

23. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201 (declaratory relief), and 2202 (further relief). This action arises under the Eighth and Fourteenth Amendments of the United States Constitution and under 42 U.S.C. § 1983. A challenge to the constitutionality of a state's procedures for lethal injection comes within the scope of § 1983. *Hill v. McDonough*, 126 S.Ct. 2096, 2099 (2006).

24. Venue in this Court is proper under 28 U.S.C. § 1391(b) because all the events giving rise to this claim have occurred and will occur within the Eastern District of Virginia. The Court has personal jurisdiction over the Defendants because they are located within this District.

## VI.  GENERAL ALLEGATIONS

25. Plaintiff realleges and incorporates by reference paragraphs 1-24 as if fully set out herein.

26. Under Virginia law, death sentences shall be carried out by "caus[ing] the prisoner under sentence of death to be electrocuted or injected with a lethal substance, until he is dead." Va. Code § 53.1-234.  The statute prescribes no specific drugs, dosages, drug combinations, or the manner of intravenous line access to be used in the lethal injection process.  The statute does not prescribe any certification, training, or licensure requires of those who participate in the execution process.  All details of the execution process are to be determined by the Director of the Department of Corrections.

27. On information and belief, some of the details of the execution process are contained in a written document that Plaintiff's counsel will be permitted to see only after signing a confidentiality agreement pursuant to a protective order.  The secrecy that attends these details, and the extraordinary efforts Virginia takes to prevent attorneys for § 1983 complainants from learning those details – even after the attorneys sign a confidentiality agreement – is alluded to in the Brief of Amicus Curiae Darick Demorris Walker, 2006 WL 558286 (Mar. 6, 2006), in *Hill v. McDonough.*

### A.  Lethal Injection

28. The Defendants first made public in early 2004 the chemicals and dosages used in past lethal injection executions.  The chemicals are 2 grams of sodium thiopental, followed by 50 milligrams of pancuronium bromide, followed by 240 milliequivalents of potassium chloride.

29. The first chemical, sodium thiopental, is an ultra short-acting barbiturate that, in an ordinary clinical dose, is typically administered only during the preliminary phase of anesthesia administration; it is not a primary form of anesthesia. There is a reasonable likelihood that sodium thiopental, if ineffectively delivered (which is particularly likely given the inadequacy of the administration procedures described in the *Walker* amicus brief and summary judgment motion), will not provide a sedative effect for the duration of the execution process. Without adequate depth of sedation, Plaintiff will experience pain and terror as a result of the conscious asphyxiation caused by pancuronium bromide, and excruciating agony from the searing burn and cardiac arrest caused by the potassium chloride.

30. Administration of the second and third chemicals is humane only if the inmate is put into and maintained at a "surgical plane" of anesthesia. A surgical plane is characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli. If the inmate does not achieve and maintain this depth of anesthesia, he will experience the terror and blinding pain caused by the second and third chemicals.

31. On information and belief, and as reported in the *Walker* amicus brief and summary judgment motion, the Defendants lack adequate training to determine whether (and when) an inmate has reached the surgical plane. On information and belief, the Defendants would be unable to determine whether an inmate had achieved and was being maintained at a surgical plane of anesthesia, even if they had adequate training to do so, because such a determination can only be made by a person who is at "bedside," and the Virginia protocol reportedly fails to place the executioners at a vantage point where they can see

11

and touch the condemned inmate.  Because of their location, executioners reportedly cannot monitor other aspects of the complex hook-up to determine that the intended quantity of anesthetic drug is actually delivered to the inmate's veins.  On information and belief, the Defendants lack the training, qualification, capacity, and authority to recognize, address, or remedy circumstances indicating inadequate delivery of sodium thiopental.

32. The second chemical, pancuronium bromide, paralyzes all voluntary muscles, including the diaphragm, but it does not affect consciousness or the perception of pain. Pancuronium bromide, administered by itself as a "lethal dose," would not result in a quick death; instead, it would ultimately cause someone to suffocate to death while still conscious.  For an individual who has a degree of awareness but is unable to make his lungs work in order to breathe, this is a terrifying experience.  Pancuronium bromide could not lawfully be used alone as the fatal agent for an execution because causing death by suffocation violates the Eighth Amendment's prohibition against cruel and unusual punishment.

33. As used in Virginia's lethal injection process, pancuronium bromide is not administered in order to cause death.  Its function in the execution process is solely cosmetic.  It makes an inmate appear serene and tranquil because it masks all voluntary muscle movements he otherwise might make.

34. Even though employed for cosmetic purposes, the use of pancuronium is not benign. Once this neuromuscular blocking agent is administered, it perversely prevents the Defendants and the public witnesses at the execution from determining whether the

Plaintiff is fully awake, only lightly sedated (and therefore still able to feel pain), or at a surgical plane of anesthesia. Because it paralyzes the muscles, it prevents the inmate from lifting a finger, crying out, grimacing, or communicating his distress in any other way. In these circumstances, only an individual who is at "bedside," who has adequate training in anesthesiology, and who is in tactile contact with the inmate can determine when the prisoner reaches a surgical plane of anesthesia and remains in that state.

35. The third chemical, potassium chloride, causes death by inducing cardiac arrest. Potassium chloride sears the nerve fibers lining the inside of the veins as it travels to the heart, and it is indescribably painful to an inmate who has any degree of consciousness. This is not the pain of ordinary cardiac arrest; it is pain that precedes cardiac arrest and results immediately when potassium chloride comes in contact with the interior of the veins. For an inmate who has retained or regained consciousness but is paralyzed and hence unable to communicate, it is agonizing torture.

36. If the Defendants use the same procedures and practices to execute Plaintiff by lethal injection that they have used in the past, there is a foreseeable and unnecessary risk that this will cause severe pain and suffering. This risk is enhanced because, upon information and belief, the protocol does not include adequate safeguards regarding the manner in which the execution is to be carried out, does not establish procedures to monitor or address failures, problems, or inadequacies in administering the execution, does not establish the minimum qualifications and expertise required of the personnel performing the critical tasks in the lethal injection procedure, does not establish appropriate criteria and standards that these personnel must rely upon in exercising their

13

discretion during the lethal injection procedures, and does not provide for review of the performance of personnel measured against such criteria.

37. The discovery obtained in *Walker* reveals some of the deficiencies inherent in the procedures and practices currently employed by the Commonwealth. The *Walker* amicus brief in *Hill* states, for example, that Virginia's lethal injection process is administered by a team of executioners led by a high school graduate with no medical training whatsoever. The executioners are not at "bedside"; they are behind a curtain some distance away from the inmate, with a small porthole that allows one member of the team to see the inmate's body on the gurney. The executioners gauge whether the inmate has achieved a surgical plane of anesthesia by listening to hear if he is snoring! From their location behind the curtain, the executioners cannot see the site of the intravenous catheter and consequently cannot determine whether, at the time the chemicals are administered, it is still properly in place or has shifted so that the chemicals infiltrate (in whole or in part) into the surrounding tissue.

38. The exhibits supporting Walker's motion for summary judgment and in opposition to the Defendants' motion for summary judgment also reveal shoddy practices that undermine confidence in the adequacy of the lethal injection process.[5] For example, there reportedly is a consistent failure to keep track of drugs dispensed, e.g., Ex. A(11) SW4 Dep. at 76:10-77:11, 141:1-10; to record correctly the actual amount the potassium chloride administered, e.g., Ex. A(19) Hinkle Dep. at 39:25-40:5; to document problems with IV

---

[5] Some of Walker's exhibits are under seal. Plaintiff's counsel in the instant case have seen or read only the redacted portions of the exhibits. At least four of the people Walker's attorneys deposed are not identified. They are referred to in the Walker pleadings as Secret Witness (SW)

lines, e.g., Ex. A(11) SW4 Dep. at 85:24-86:25; 101:1-22; to record deviations from the procedures in the execution manual, e.g., *id.* SW4 Dep. at 109:15-111:21; or to follow instructions in filling out critical paperwork, e.g., *id.* SW4 Dep. at 102:5-8; 128:8-129:24, 132:2-24, 141:4-5.

39. The Walker records also reveal problems placing intravenous lines, *id.*, SW4 Dep. at 102:18-103:11; other problems with IV lines, *id.*, SW4 Dep. at 101:4-22, 130:16-23; inconsistent training by the execution team, Ex. A(14), Parker Dep. at 160:9-14; not following manufacturer's instructions regarding dilution of potassium chloride, *id.*, Parker Dep. at 71:22-73:3; and perhaps most troubling of all, mislabeled syringes, Ex. A(11) SW4 Dep. at 128:13-16 ("the person who filled it out put down the wrong numbers on the syringes. That's all that was.").

40. The Walker records further contain inconsistent statements, raising concerns about the truthfulness of the Defendants' representations about the lethal injection procedures. When asked in discovery whether a training plan had ever been developed, for example, the Defendants represented that one had. *Walker v. Johnson,* No. 1:05cv934, Def. Response to Requests for Admissions, March 1, 2006 (Request for Admission 40. "Virginia has never developed a 'training plan' for training members of the execution team." Response: "Deny"). During depositions, however, the Defendants stated that no such plan has ever been created. Ex. A(5) SW2 Dep. at 57:9-10.

41. The risks inherent in Virginia executions have been illustrated in executions performed in other states whose practices and procedures are materially indistinguishable from those in

---

1, 2, 3, and 4. *See* Ex. A (23), (5), (6), and (11), respectively.

Virginia. California, for example, repeatedly has noted problems in performing executions by lethal injection, as reported in the Brief of Amicus Curiae Habeas Corpus Resource Center, 2006 WL 558287 (Mar. 6, 2006), in *Hill,* and in court decisions. In *Morales v. Hickman, supra,* for example, the district court concluded that, at a minimum, six of California's thirteen executions by lethal injection had significant problems related to the risk of improper anesthesia administration. California's protocol calls for the administration of 5 grams of sodium thiopental – more than twice the dosage prescribed in Virginia's protocol – and both parties in *Morales* agreed that this quantity, if properly administered, would be sufficient not only to render the prisoner unconscious, but to stop his breathing within one minute and result in death within a few minutes. However, the state's execution logs showed that several prisoners did not react to the sodium thiopental in this expected fashion. For example, Stephen Wayne Anderson continued breathing for five minutes, and the remainder of his execution took thirty minutes, during which his chest and stomach heaved more than thirty times. These facts are utterly inconsistent with adequate administration of execution drugs and strongly suggest that Anderson was conscious during his execution. The execution logs also revealed inconsistencies and irregularities in the lethal injection executions of Manuel Babbit, William Bonin, Clarence Ray Allen, Darrel Keith Rich, and Stanley "Tookie" Williams.

42. The Missouri district court's recent unpublished decision in *Taylor, supra,* similarly reports the absence of checks and balances and oversights in Missouri. Although Missouri, unlike Virginia, uses a physician as its executioner, the physician it employs is dyslexic and has admitted that he occasionally misreads or miswrites numbers. He has

16

*ad hoc* reduced the quantity of sedating agent from 5 grams to 2.5 grams because he finds it difficult to mix a solution containing 5 grams. He has no training in anesthesiology, and he can monitor anesthetic depth only by viewing an image of the inmate on a videotape of the execution chamber.

43. When Ohio executed Joseph Clark on May 2, 2006, the inmate had to inform Department of Corrections personnel after they spent 25 minutes trying to find a suitable vein for injection that "[t]hese don't work" and "[t]hey're not working," as the execution team tried to start the injection. *See* Exhibit G. The curtain to the execution chamber was then closed, and "Clark could be heard moaning and groaning from behind the curtain." *Id.* The execution process began at 10:00 a.m. and Clark was not pronounced dead until 11:26 a.m. *Id.* The New York Times reported that Ohio's "lethal injection protocol was changed after the execution of" Clark including use of "a new method to make sure the veins stay open once entryways are inserted." Exhibit H.

44. Postmortem toxicology reports from prisoners executed by other states suggest that some prisoners likely remained conscious during the administration of lethal drugs. These reports indicate that the amounts of thiopental in the inmate's blood after execution were substantially below the level that would have been necessary to ensure a surgical plane of anesthesia.

45. There is no principled reason for a court to conclude that the kinds of problems and inadequacies in the lethal injection procedures revealed in these and other states do not also occur in Virginia. On information and belief, Virginia does not provide meaningfully greater safeguards in its procedures and practices than do the other states.

46. Because of the legal, moral, and ethical restrictions on human euthanasia, the best model and source of information about humane and inhumane protocols for extinguishing life can be found in studies of methods for euthanasia of animals.

47. The American Veterinary Medical Association Panel on Euthanasia regularly studies various protocols for the euthanasia of animals to determine whether they are humane. It periodically issues a report identifying acceptable and unacceptable protocols for animal euthanasia. The AVMA report is not intended to address procedures for the execution of humans. It is, nonetheless, a useful guide from a scientific standpoint. On information and belief, there is no physiological reason why a procedure that is inhumane when used to euthanize animals would be humane when used to execute human beings.

48. The AVMA explicitly forbids the use of potassium chloride in animal euthanasia if the animal is not at a surgical plane of anesthesia. According to the 2000 Report of the AVMA Panel on Euthanasia, "[i]t is of utmost importance that personnel performing this technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously. Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia." *Id.* at 681. Exhibit A (10).

49. The AVMA 2000 Report also states that "A combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent." *Id.* at 680. Exhibit A(10).[6]

---

[6] The AVMA as an organization has expressed concern that some statements in its 2000 Report have been misinterpreted in litigation relating to procedures for the execution of humans. See statement at https://www.avma.org/issues/animal_welfare/euthanasia.pdf. Prominent

50. Pursuant to Va. Code § 3.1-796.96(D), the State Veterinarian of Virginia is charged with the responsibility of determining acceptable methods of euthanasia for animals. The State Veterinarian has promulgated regulations that approve only three procedures for routine animal euthanasia: (i) intravenous sodium pentobarbital, (ii) carbon monoxide gas, or (iii) any other method considered and recommended as humane by the most recent report of the American Veterinary Medical Association's Panel on Euthanasia.[7] Thus, Virginia law does not permit for animal euthanasia the kind of protocol that Defendants have used to carry out executions by lethal injection. The Commonwealth does not require that executioners of humans (as opposed to those who euthanize animals) be "trained and knowledgeable in anesthetic techniques, and [be] competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously" to ensure that the subject is at a surgical plane.

**B. Electrocution**

51. Since the death penalty was reinstated in 1977, Virginia has executed 28 men by electrocution. Until 1995, electrocution was Virginia's only method of execution. Since then, four inmates have affirmatively chosen that method.

---

veterinarians and veterinary anesthesiologists, however, continue to rely on veterinary science and experience for the proposition that protocols for lethal injection of humans are inhumane (a) when a neuromuscular blocking agent is used along with a barbiturate, and (b) when potassium chloride is administered to a person who is not at a surgical plane of anesthesia. *See* Brief of Amici Curiae Drs. Kevin Concannon, Dennis Geiser and Glenn Pettifer, 2006 WL 542180 (Mar. 6, 2006), in *Hill v. McDonough.*

[7] The Virginia regulation states that "Sodium Pentobarbital, with or without lidocaine, is the euthanasia agent of choice and is recommended above all others at this time." Exhibit I at 6.

52. At least four of these 28 electrocutions (14 percent) allegedly were botched. On August 10, 1982, Frank J. Coppola was put to death by electrocution. After two jolts of electricity had been applied to him, the death chamber reportedly filled with the smell and sizzle of burning as Coppola's head and leg burst into flames. Deborah Denno, *When Legislatures Delegate Death*, 63 Ohio St. L.J. 106, 137 (February 2002) [hereinafter "Denno"]. On October 17, 1990, blood poured from Wilbert Lee Evans' eyes and nose after the current was applied. Witnesses noted audible moaning during the electrocution. Evans reportedly made a sizzling sound like a pressure cooker before its top has been put on. Mike Allen, "Minister Says Execution Was Unusual," *Richmond Times-Dispatch*, Oct. 20, 1990, at B1. On August 22, 1991, Derick Lynn Peterson moaned audibly as electric current was applied to him. After two minutes of current and a four minute wait, a prison doctor checked Peterson's pulse with his stethoscope and announced that Peterson was not dead. After another four-minute wait, the doctor again checked the pulse and announced that Peterson had not expired. Finally, a second surge of electricity was applied. In total, it took over thirteen minutes to complete Peterson's execution. Mike Allen, "Death Diary: Pleas, Anger Fill Days Before Execution," *Richmond Times-Dispatch*, Aug. 25, 1991, at B1; *see also* "A Bungled Execution," *Richmond Times-Dispatch*, Aug. 29, 1991, at A18. A witness to Roger Keith Coleman's May 20, 1992, electrocution reported smoke coming from Coleman's leg. Coleman required two 1,700-volt jolts to die. *See* Denno, *supra*, at 138.

53. On information and belief, Virginia made lethal injection the default method of execution as a direct response to continuing concerns about the constitutionality of electrocution.

*Cf.* Va. Code § 53.1-234.  In fact, state lawmakers who amended the law to provide for lethal injection expressly voiced concerns about the "cruelty" of electrocution.  *See* Videotape (Part VIII):  Va. Gen. Assemb. Deb., H.B. 862, Feb. 15, 1994 (on file with the Library of Virginia).  The intent behind the amendment was to offer the least cruel and most civilized method of execution according to the most recent medical knowledge.  *See id.*  Plaintiff agrees that lethal injection, using appropriate procedures and safeguards, is a more humane method of execution than is electrocution.

54. Although the United States Supreme Court previously has held that electrocution is constitutional under the Eighth Amendment, the Court later granted certiorari in *Bryan v. Moore*, 528 U.S. 960 (1999), a case arising in Florida, in order to re-examine the issue. The Court reportedly granted certiorari as a result of allegedly botched executions using electrocution in Virginia and elsewhere, and in light of changes in circumstances.  The Court later dismissed the writ of certiorari as improvidently granted due to an intervening change in Florida law.  *Bryan v. Moore*, 528 U.S. 1133 (2000).  In *In re Tarver*, 528 U.S. 1152 (2000), a case arising in Alabama, four justices reiterated that they wished to reconsider the constitutionality of electrocution, although they chose not to grant certiorari in that particular case.

55. Based on similar concerns, the Supreme Court of Georgia has held, under its state constitution, that electrocution violates the prohibition against cruel and unusual punishment.  *Dawson v. State*, 554 S.E.2d 137, 144 (Ga. 2001).

56. Electrocution is practiced in no other country in the world as a method of execution.

21

57. Although once practiced by 26 states, only one state (Nebraska) now retains electrocution as its sole method of execution.

58. The Humane Society and the American Veterinarian Medical Association both prohibit the use of electrocution for the euthanasia of animals.

59. On information and belief, electrocution as currently performed causes the condemned great pain and suffering.  The nature and degree of damage done to a person who is executed through electrocution far exceeds that necessary to bring about death.

60. The use of electrocution violates the evolving standards of decency, particularly in light of the fact that there are humane alternatives.

## COUNT I

### VIOLATION OF RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT PURSUANT TO THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE  UNITED STATES CONSTITUTION
(42 U.S.C. § 1983)

61. Plaintiff realleges and incorporates by reference paragraphs 1-60 as if fully set out herein.

62. Defendants Gene M. Johnson, George M. Hinkle, Loretta K. Kelly, and John Does 1-100, acting under color of Virginia law, intend to execute Plaintiff in a manner that will cause unnecessary pain in the execution of a sentence of death, thereby depriving Plaintiff of his rights under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment, and his Fourteenth Amendment right to due process of law, in violation of 42 U.S.C. § 1983.

63. Virginia's practices and procedures violate Plaintiff's rights under the Eighth and Fourteenth Amendments because (a) the practices and procedures create the unreasonable and unacceptable risk of unnecessary physical and psychological pain; (b) the practices

22

and procedures do not comport with contemporary norms and standards of society; and (c) the practices and procedures offend the dignity of the person and society.

64. The Defendants' practices and procedures for lethal injection require utilization of three dangerous chemicals but do not ensure that the personnel entrusted with the lethal injection process possess the proper and necessary training, experience, or expertise to administer those drugs. Moreover, the practices and procedures fail to specify any timing for the administration of the three separate chemicals, which is an essential requirement for their proper administration.

65. The use of pancuronium bromide as part of the lethal injection process serves no legitimate penological purpose. The use of that chemical increases the risk that Plaintiff will be conscious and will feel the burning veins and heart failure caused by the administration of potassium chloride. Without the use of pancuronium bromide, an inmate would be able to indicate that he is still conscious prior to or at the onset of the administration of potassium chloride, and thereby enable the Defendants to take immediate corrective action. This is particularly crucial because the Plaintiff will be alone in a room when he is executed. Once he is paralyzed, it will be impossible for any observer under Virginia's current practices and procedures to determine whether Plaintiff is conscious when he receives the potassium chloride

66. The absence at "bedside" of a person trained and knowledgeable in anesthetic techniques and competent in assessing anesthetic depth increases the risk that Plaintiff will be conscious and in excruciating pain during an execution by lethal injection. Only a person with this kind of training who is in tactile contact with the inmate can determine

23

adequately when the prisoner reaches a surgical plane of anesthesia and remains in that state. An inmate will experience the terror and pain of the pancuronium bromide and potassium chloride if he does not achieve a surgical plane of anesthesia before the other drugs are administered and does not maintain that plane for the duration of the execution.

67. On information and belief, Virginia's lethal injection procedure fails to address the individual prisoner's medical condition and history. On information and belief, several drugs that are regularly prescribed to death row inmates interfere with the ability of sodium thiopental to act properly as an anesthetic. On information and belief, prisoners are given Valium shortly before the execution, a drug which can also interfere with sodium thiopental's effectiveness.

68. On information and belief, Virginia's practices and procedures contain no description of the training, credentials, certifications, experience, or proficiency required of any personnel involved in the lethal injection procedure, notwithstanding the fact that it is a complex medical procedure requiring a great deal of expertise in order to be performed correctly. On information and belief, Virginia's protocol does not require at the execution the presence of any personnel who possess sufficient expertise to insert an intravenous line properly, determine if there is a blockage or leakage in the intravenous line, or evaluate whether a prisoner is properly sedated before proceeding with the painful parts of the execution process.

69. On information and belief, Virginia's practices and procedures for lethal injection fail to address any reasonably foreseeable complications with any appropriate medical response. On information and belief, the protocol includes no safeguards that would protect the

24

prisoner in the event a stay of execution is entered after the lethal injection process has begun. As a result, the protocol fails to provide any protections to prevent a prisoner from being wrongly executed should a reprieve be granted after the process has begun but before death has occurred.[8] On information and belief, a prisoner could readily be resuscitated any time before the potassium chloride is administered, and it would be possible, although admittedly more challenging, to resuscitate a prisoner even after administration of potassium chloride. In either event, resuscitation would require preparation as well as close proximity of the necessary equipment, medication, and properly trained personnel. The omission of such equipment and personnel further undermines the constitutionality of Virginia's procedure.

70. Although it is possible to conduct executions by lethal injection in a constitutionally compliant manner, the Defendants have chosen not to do so. They could choose to use different chemicals that pose a low risk of administration error; instead, they have knowingly or recklessly chosen to use chemicals that pose a high risk of administration error. Moreover, having chosen the high-risk chemicals, the Defendants have failed to ensure that the personnel who administer the chemicals possess the training, experience, expertise, and ability to administer such chemicals properly and humanely, and to adequately monitor their effect.

---

[8] In *In re Readoption with Amendments of Death Penalty, supra,* the court held *inter alia* that New Jersey's regulations for lethal injection could not be implemented without an explanation for the absence of an emergency cart with equipment, supplies, and medications to revive the inmate in the event of a last minute stay of execution.

71. Virginia's current procedures for electrocution inflict unnecessary pain and inflict cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution.[9]

72. Not more than fifteen days before his scheduled execution, the Defendants will offer Plaintiff a choice of lethal injection or electrocution, and will inform him that if he refuses to make a choice, the statutory default is lethal injection.  Va. Code § 53.1-234.  Plaintiff acknowledges that if he elects to choose a method of execution, he cannot challenge the constitutionality of the chosen method. *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999) (per curiam).  Plaintiff likewise acknowledges that if he elects to choose a method, he may lack standing to challenge the constitutionality of the method he has rejected.  The Defendants, however, acting under color of state law, intend to construe Plaintiff's refusal to make a choice as equivalent to an affirmative choice of lethal injection (because Plaintiff will know that as a consequence of refusing to choose, the Defendants will exercise the legislature's choice to execute him by lethal injection).  Thereafter, Defendants will refuse to entertain any objections Plaintiff may have to any method of execution, and this will violate his right to due process of the law under the Fourteenth Amendment to the United States Constitution.

---

9 Plaintiff does not presently intend to choose electrocution.  He has included a challenge to electrocution in this Complaint solely for defensive purposes in the event that this Court or a higher court concludes that the availability of electrocution makes Plaintiff's challenge to lethal injection moot.  Plaintiff acknowledges and accepts this Court's statement regarding electrocution in its Opinion issued on September 22, 2006, with respect to his initial § 1983

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Christopher Scott Emmett prays as follows:

73. Plaintiff realleges and incorporates by reference paragraphs 1-72 as if fully set out herein.

74. Wherefore, Plaintiff prays as follows:

75. That the Court issue a judgment declaring that the Defendants' protocols, policies, practices, and acts and omissions for lethal injection as described herein violate Plaintiff's rights to be free of cruel and unusual punishment and to due process of law, as guaranteed by the Eighth and Fourteenth Amendments of the Constitution of the United States.

76. That the Court issue a judgment declaring that electrocution, as specifically carried out by Defendants as an alternative to lethal injection, constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

77. That the Court permanently enjoin the Defendants, their officers, agents, employees, and successors in office, along with those acting in concert with them, from engaging in the unlawful practices described herein.

78. That the Court direct the Defendants to come forward with a proposal for a new protocol for lethal injection, afford the Plaintiff an opportunity to submit objections to the proposal, and hold an evidentiary hearing at which the parties may present evidence and argument concerning the lawfulness of the proposed new protocol.

79. That the Court retain jurisdiction over this action until the Court's order is carried out.

---

Complaint.

27

80. That the Court grant Plaintiff's appointed counsel reasonable attorneys fees for this "subsequent stage of available judicial proceedings," 18 U.S.C. § 3599(e) and authorize funds for necessary expert assistance under 18 U.S.C. § 3599(f); and

81. That the Court grant such other relief as the Court deems just, proper, and equitable under the circumstances.

Respectfully submitted,

**CHRISTOPHER SCOTT EMMETT**

By: _____

Matthew Engle
Jennifer Givens
Virginia Capital Representation Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
434-817-2970
434-817-2972 (fax)
*Counsel for Plaintiff*

Dated: April 19, 2007

28

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Plaintiff's Complaint for Equitable and

Injunctive Relief was hand-delivered this 19th day of April, 2007 to:

> Richard C. Vorhis
> Senior Assistant Attorney General
> Office of the Attorney General
> 900 East Main Street
> Richmond, Virginia 23219

29