IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| CHRISTOPHER SCOTT EMMETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 3:07CV227–HEH |
| | ) | |
| GENE M. JOHNSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Christopher Scott Emmett, a Virginia state inmate sentenced to death, brings this civil rights action under 42 U.S.C. § 1983.  By order entered on April 16, 2007, by the Circuit Court for the City of Danville, Virginia, he is scheduled for execution on June 13, 2007.  The complaint, filed on April 19, 2007, seeks equitable and injunctive relief under § 1983 for violations, threatened violations, or anticipated violations of Plaintiff's right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## I.  PROCEDURAL BACKGROUND

Plaintiff does not challenge the constitutionality of his state court capital murder conviction, his death sentence, or the constitutionality of the Virginia statute providing for death by lethal injection or electrocution.  Plaintiff's claims focus strictly on the methods of performing such procedures under Virginia Code § 53.1-234.  Both sides have filed detailed memoranda of law supporting their respective positions, including an array of

supporting exhibits.  The Court heard oral argument on May 24, 2007.

Following his conviction in the trial court of capital murder in the commission of robbery, Plaintiff waived his right of direct appeal to the Supreme Court of Virginia.  As required by Virginia Code § 17.1-313(C)(1), the Supreme Court of Virginia conducted the statutorily-mandated review of the death sentence received by Plaintiff.  After a thorough examination of the record, the Supreme Court of Virginia upheld the death sentence imposed in this case.  *See Emmett v. Commonwealth*, 264 Va. 364, 569 S.E.2d 39 (2002).  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Aside from questioning the utility of one element of the chemical formula and the prescribed quantity of another, Plaintiff does not directly assail the chemical protocol used to carry out the execution.  Although Plaintiff challenges both methods of execution as posing an undue risk of an Eighth Amendment violation, the primary focus of his claim is the lethal injection process.  However, in order to fully appreciate the issues raised in this aspect of Plaintiff's constitutional challenge, it is important to understand the chemical protocol employed by the Virginia Department of Corrections in carrying out a sentence of death by lethal injection.

## A.    Virginia's Lethal Injection Procedure

There are three stages to the lethal injection procedure.  All chemicals used in the process are remotely introduced by pre-established intravenous (IV) lines.  Initially, two grams of sodium thiopental, a barbiturate that induces sleep, are administered.  A saline solution is then employed to flush the IV line.  The saline flush ensures that the full dose

2

of sodium thiopental is delivered and eliminates the possibility of an interaction between sodium thiopental and pancuronium bromide outside of the body.  Any interaction between the sodium thiopental and the second stage drug, pancuronium bromide, prior to the chemicals entering the inmate's body, could significantly hinder the effectiveness of the sodium thiopental.

Following this flushing procedure, the second chemical, pancuronium bromide, a neuromuscular blocking agent which causes paralysis in all muscles except the heart, is administered by IV.  Pancuronium bromide suppresses involuntary seizures or motor manifestations that may occur during the execution process.  The 50 mg quantity of pancuronium bromide administered during this stage is sufficient to cause the inmate to suffocate.  Next, saline solution is again introduced to flush the line.

The final phase involves the administration of 240 milliequivalents of potassium chloride, which causes cardiac arrest.  Within moments after the potassium chloride has been injected, the heart of the inmate will stop beating.  Shortly thereafter, brain activity will cease.  A physician monitors the inmate's heart beat and pronounces death.

## B.    Plaintiff's Challenges

The complaint targets a number of aspects of the methodology employed in administering the chemical formula.  Plaintiff contends that the correctional personnel responsible for carrying out the execution lack adequate training and predetermined procedures to carry out the execution without subjecting the inmate to undue pain and suffering.  He maintains they lack medical training and expertise and that established

procedures fail to specify timing for administration of chemicals.  Plaintiff argues that the minimum standard of care would require a person trained in anaesthetic techniques to remain at the bedside of the inmate to monitor the depth of the anaesthesia to assure a proper surgical plane.  He cites irregularities and inconsistencies in the administration of the lethal injection protocol gleaned from Department of Corrections records.  In support of his claims, Plaintiff offers anecdotal evidence of what was perceived to be defective executions mostly occurring outside the Commonwealth of Virginia.

While Plaintiff does not contest the chemical recipe per se, he does question the use of pancuronium bromide, which masks the inmate's complaints and symptoms of pain.  He argues that its use facilitates cruelty because it inhibits a conscious, suffering inmate from expressing his pain and discomfort.  Plaintiff also suggests that the quantity of the initial barbiturate, sodium thiopental, may be inadequate to ensure an appropriate surgical plane.  Both of these issues have been previously addressed by this and other courts in this district.  *See, e.g., Walker v. Johnson*, 448 F. Supp. 2d 719, 720 (E.D. Va. 2006); *Reid v. Johnson*, 333 F. Supp. 2d 543, 547–48 (E.D. Va. 2004).

Plaintiff also cites a number of purported procedural deficiencies, such as failure to address the individual inmate's medical condition and history, no provision to address complications, no mechanism for enforcement of violations of protocol, and no means to resuscitate an inmate if necessary during the execution process.

Secondarily, and in order to preserve the record, Plaintiff contests the constitutionality of the electrocution process employed in Virginia.  He contends that the

current procedure causes the condemned inmate to be subjected to great pain and suffering.  In his view, electrocution violates the evolving standards of decency, particularly in light of the fact that there are humane alternatives.  (Compl. ¶¶ 59–60.) Despite random musings to the contrary by some Justices, electrocution remains a constitutional method of execution.  *See In re Kemmler*, 136 U.S. 436, 449 (1890); *Bell v. True*, 413 F. Supp. 2d 657, 737 (W.D. Va. 2006).

The complaint in this case seeks both injunctive and declaratory relief.  Plaintiff urges the Court to declare that the protocol's policies and practices utilized for lethal injection, as well as those used for electrocution, violate Plaintiff's rights guaranteed by the Eighth and Fourteenth Amendments to the Constitution of the United States.  Plaintiff also seeks permanent injunctive relief barring the Commonwealth of Virginia and its agents from engaging in such unlawful practices.  To enable the Court to address the issues raised prior to Plaintiff's execution date of June 13, 2007, the Court, at its April 30, 2007 scheduling conference, set this case for a preliminary injunction hearing on May 24, 2007.  Plaintiff later advised the Court in its opening brief that it was not requesting a preliminary injunction, but a full hearing on the merits.  Defendants immediately filed an objection citing the inability to complete discovery and adequately prepare for a hearing on the merits without staying Plaintiff's date of execution.

Almost every issue raised by Plaintiff has been heard and decided by this or another court in this district.  *See Walker*, 448 F. Supp. 2d 719; *Lenz v. Johnson*, 443 F. Supp. 2d 785 (E.D. Va. 2006); *Vinson v. Johnson,* No. 3:06CV230-HEH, 2006 WL

4509943 (E.D. Va. Apr. 19, 2006); *Reid*, 333 F. Supp. 2d 543.  Plaintiff, however, raised

two issues not previously decided by a court in this district.  First, that the established

procedure fails to require adequate formal training of execution team members and the

presence of necessary medical equipment to resuscitate the inmate in the event that a stay

of execution, commutation, or reprieve is granted after the administration of the lethal

chemicals has commenced.  Second, Plaintiff submits that the most recent decision in this

district, namely *Walker v. Johnson*, was decided under an incorrect legal standard.

Moreover, Plaintiff further points out that since prior cases were decided, several states

have publicly questioned, suspended, or substantially revised their lethal injection

protocols, and that at least one other execution in Virginia has been "troublesome."

Plaintiff was initially sentenced to death in 2002.  His death sentence was affirmed

by the Supreme Court of Virginia on September 13, 2002.  The denial of his petition for

habeas corpus was affirmed by the United States Court of Appeals for the Fourth Circuit

on January 23, 2007.  Aside from Plaintiff's contention that recent complications with the

lethal injection process warrant a renewed, closer examination of its constitutionality,

most issues comprising Plaintiff's claim were ripe for adjudication several years ago.  In

other words, they could have been resolved within a time frame which would have

permitted full discovery, adequate preparation, appropriate briefing, and an opportunity

for detailed analysis by the Court without the necessity for a stay of execution.

As the United States Supreme Court pointed out in *Nelson v. Campbell,* 541 U.S.

637 (2004), this Court must consider the timing and nature of Plaintiff's request under

general equitable principals. *Id*. at 649–50.  Moreover, as the Court further noted in

*Nelson*, "there is a strong equitable presumption against the grant of a stay where a claim

could have been brought at such a time as to allow consideration of the merits without

requiring entry of a stay." *Id*. at 650.  The United States Court of Appeals for the Fourth

Circuit has admonished that, "[l]ast minute stays [of execution] . . . represent an

interference with the orderly processes of justice which should be avoided in all but the

most extraordinary circumstances." *Stockton v. Angelone*, 70 F.3d 12, 13 (4th Cir. 1995).

The issues raised in this case are undoubtedly important and deserve careful

consideration, however, given the prior history of their review and this late hour, it is

doubtful that they rise to the level of "the most extraordinary of circumstances." *Id.*

Nevertheless, this Court will assess whether Plaintiff's claims merit preliminary

injunctive relief.  If so, the Court will grant a stay of execution and thereafter conduct a

full hearing on the merits.

The permissible scope of a constitutional challenge to execution procedures

brought under 42 U.S.C. § 1983 is narrow.  A civil rights action is not an appropriate

vehicle to contest either an inmate's sentence of death or the constitutionality of the death

penalty generally.  In this case, Plaintiff does neither.  The United States Supreme Court

has held that the boundaries of civil rights litigation in this context are wide enough to

encompass medical procedures incident to the execution process, and the chemical

formula used in carrying out the lethal injection.  *See Hill v. McDonough*, 126 S. Ct.

2096, 2101–04 (2006); *Nelson*, 541 U.S. at 647–48.  The Fourth Circuit adopted this

rationale in *Reid v. Johnson*, No. 03-7916, 105 Fed. Appx. 500, 503 (4th Cir. Aug. 2, 2004) (unpublished).  It would therefore appear that those aspects of Plaintiff's claim that fall within the ambit of the Eighth Amendment are properly before the Court.  In reviewing Plaintiff's claims, however, the Court must be mindful that it is not the office of a federal court to dictate to the Commonwealth of Virginia the precise methodology it employs in carrying out a lawful death sentence, as long as the procedure is constitutionally sound and does not subject the inmate to cruel and unusual punishment.  Whether or not the procedure used should conform to prevailing medical standards of care, or whether there is a more humane execution procedure, is a decision to be made by the Virginia General Assembly and not this Court.

## II.  PRELIMINARY INJUNCTIVE RELIEF

Although the plaintiff would have preferred an initial full hearing on the merits, because of time constraints, this Court will proceed first with a hearing to determine Plaintiff's entitlement to preliminary injunctive relief.  To warrant the extraordinary remedy of injunction, Plaintiff must establish four factors articulated in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co.*, 550 F.2d 189, 193–96 (4th Cir. 1977).  The Fourth Circuit has historically used a balance of hardships test to determine a plaintiff's entitlement to preliminary injunction.  The analytical framework includes: "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest."

*Rumcreek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991) (internal quotation marks omitted).

In order to prevail, Plaintiff must demonstrate a "clear showing of irreparable harm" that is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (internal quotation marks omitted). The second step in reviewing requests for preliminary injunctive relief is to consider the likelihood of harm to the defendant from the grant of injunctive relief, and then to balance the likelihood of irreparable harm to the plaintiff for failing to grant such relief against the likelihood of harm to the defendant, if it is granted. *Direx Israel, Ltd.*, 952 F.2d at 812.

The result of this balancing determines the degree to which the plaintiff must show a likelihood of success on the merits to obtain a preliminary injunction in the third step of the process. Under this third step, the Fourth Circuit has explained that if after balancing the irreparable harm to the plaintiff against the harm to the defendant, the balance tips decidedly in favor of the plaintiff, a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for litigation and thus, for more deliberate investigation. As the balance tips away from the plaintiff, a stronger showing on the merits is required. *Id.* at 812–13. In other words, "the importance of probability of success increases as the probability of irreparable injury diminishes." *Blackwelder Furniture Co.*, 550 F.2d at 195. Last, the Court must consider whether the public interest favors the granting of

preliminary injunctive relief.  *Rumcreek Coal Sales, Inc.*, 926 F.2d at 359.

"[T]he balancing of hardships must be analyzed conceptually before and separately from the likelihood of success on the merits, but once a court has performed these separate analyses, it must then make the equitable determination whether to grant injunctive relief."  *Ciena Corp. v. Jarrard*, 203 F.3d 312, 323 (4th Cir. 2000).

### A.  Facts Pertinent To Plaintiff's Execution By Lethal Injection[1]

In addition to the facts set forth above pertaining the Virginia's lethal injection procedure, the Court finds that the record establishes the following facts relevant to Plaintiff's demand for injunctive relief.  The execution takes place in a one room chamber.  The inmate is strapped to a gurney in the front of the chamber, and the executioner, the IV team, and the physician who pronounces death are a few feet away, behind a curtain in the rear of the chamber.  The curtain has a window so that the executioner can observe the administration of the lethal drugs.

Prior to the execution, electrodes, which serve the heart monitor, will be attached to Plaintiff.  The heart monitor is watched by a physician who also is present during the administration of the lethal chemicals.  Before an execution, inmates are sometimes offered Valium, but are not required to take it.[2]  The average duration of an execution in

---

[1] The parties have relied extensively upon the record developed in *Walker v. Johnson*, 448 F. Supp. 2d 719 (E.D. Va. 2006).  The Court has reviewed such records and agrees with Judge Hilton's apt summary of many of the pertinent facts.

[2] Although Plaintiff suggested in his complaint that the Valium could negatively interact with the other chemicals introduced during execution, he did not come forward

10

Virginia, from the introduction of the first drug to death, is less than five minutes.  When the chemicals are properly administered, the chance of an inmate feeling any pain associated with his execution is less than 3/100 of one percent (.03%).[3]  Plaintiff has not adduced any evidence that suggests his particular physical characteristics are likely to increase that risk.

Virginia has taken considerable effort to ensure that human error or defective equipment do not increase the risk that Plaintiff will suffer more than de minimus pain. Virginia's execution protocol provides very specific step-by-step directions for carrying out an execution.  Additionally, almost every stage of the execution process, from the preparation of the syringes to site selection of IV lines, is supervised by a team leader with decades of experience in carrying out lethal injections.  Furthermore, Virginia always sites two IV lines on the condemned inmate so that members of the execution team can quickly switch to the secondary line in the event there is difficulty with the primary line.  Prior to administering the lethal chemicals, team members test the IV lines using saline solution.  During the execution process, the individual administering the drugs can observe the inmate and the IV lines to ensure that the drugs are reaching the

---

with persuasive evidence to support that position.  Dr. Dershwitz asserts that the Valium would potentiate the effects of the sodium thiopental.

[3] Although Dr. Lowson questioned Dr. Dershwitz's confidence regarding the ability of prison staff to administer the drugs, he offered no plausible basis for challenging Dr. Dershwitz's prediction regarding the effect of the drug if administered properly.

inmate in the proper manner.

Members of the execution team have significant medical experience in the relevant areas of installing and operating IV equipment.  They undergo eight hours of thorough, intensive training per month.  A physician trains new members of the IV team to ensure their proficiency in the necessary skills.  Additionally, the team members run through numerous simulated executions during which they practice their responses to a variety of contingencies, from unruly inmates to improperly flowing IV lines.  The record provides no support for Plaintiff's contention that lack of training and proficiency on the part of the execution team creates any significant risk that Plaintiff will not receive the full dose of sodium thiopental.

As a more general matter, Plaintiff has not adduced any evidence that indicates any significant possibility that he will experience pain during his execution.  Indeed, the record of Virginia's past executions reflects the contrary.  Specifically, the submitted exhibits lead this Court to conclude that, during past executions, the condemned inmate received sufficient amounts of sodium thiopental, became unconscious, and remained so for the duration of the execution.

### B.      Likelihood Of Irreparable Harm To Plaintiff

To warrant the extraordinary remedy of preliminary injunctive relief, Plaintiff must demonstrate a likelihood that immediate irreparable harm will occur.  *See Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997).  "'The rule barring consideration of remote or speculative injury for purposes of a preliminary injunction applies despite the degree of

injurious consequences.'" *Reid*, 333 F. Supp. 2d at 550 (quoting *Hodges v. Abraham*, 253 F. Supp. 2d 846, 864 (D.S.C. 2002)).  The likelihood of the predicted harm is the central consideration in the preliminary injunction analysis because it serves to "limit the deployment of the heavy artillery of preliminary injunctive relief to situations in which it is readily apparent to the court that such relief is actually necessary to prevent a harm from occurring." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 530 (4th Cir. 2003).  "When the court . . . cannot say with confidence that the harm is more likely than not to occur *at all,* the proper conclusion to draw is that the plaintiff has failed to make the clear showing required."  *Id.*  "Furthermore, the plaintiff must demonstrate a link between his underlying challenge and the predicted irreparable injuries."  *Reid*, 333 F. Supp. 2d at 550.

The Court accepts "that any harm suffered by [Plaintiff] will be irreparable in the sense that it cannot be undone after the fact of his execution.  The more difficult question is what level of pain is prohibited."  *Reid*, 333 F. Supp. 2d at 551(citing *In re Kemmler*, 136 U.S. 436, 447 (1890)).  In this context, Plaintiff's harm "must at least satisfy the Eighth Amendment's objective component for inmates challenging their conditions of confinement or medical care."  *Id.* at 551(citing *Nelson*, 541 U.S. at 644–45).  "Thus, only that unnecessary pain that [Plaintiff] is likely to experience which is 'serious' or 'significant' will be weighed."  *Reid*, 333 F. Supp. 2d at 551 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)).

Plaintiff asserts that absent a preliminary injunction and consequent judicially

13

dictated procedural modifications, there is a grave risk that he will retain or regain consciousness after the injection of the sodium thiopental and therefore experience the pain associated with the potassium chloride.  In an effort to highlight such a risk, Plaintiff stresses the fact that, in 10 out of 70 prior executions, second doses of pancuronium bromide and/or potassium chloride had to be administered.  In an exercise of extrapolatory logic, Plaintiff suggests this fact demonstrates that an insufficient dose of the sodium thiopental reached the inmate.  He then deduces that the inmate must have experienced the pain associated with potassium chloride.  Such a theory, however, is not supported by the witnesses to prior executions who assert that previously executed inmates were unconscious.  The witnesses never indicated that the condemned inmates exhibited any signs of pain.  In response to such evidence, Plaintiff rejoins that the paralytic effects of the pancuronium bromide prevented any expressions of pain.

Plaintiff fails to demonstrate how, in light of the fact that the same IV tube is used to administer the sodium thiopental and pancuronium bromide, an inmate would fail to receive the beneficial effects of sodium thiopental, but nevertheless experience all of the debilitating effects of the subsequently administered pancuronium bromide.  *See Walker*, 448 F. Supp. 2d at 723.

Next, Plaintiff maintains that, because the deposition testimony of the execution team "is rife with confusion and contradictions about the protocols and about how lethal injections are actually administered," (Pl.'s Reply Br. 4), there is reason to believe that inmates are not receiving the required dosage of sodium thiopental.  At best, the evidence

identified by Plaintiff demonstrates some minor variances from the execution protocol, and a disparity between the witnesses' recollection of past executions and the documented history of those events.  Conspicuously absent from Plaintiff's list is any confusion regarding whether the condemned inmate received the required dose of sodium thiopental and was unconscious during the administration of the pancuronium bromide.  There is no evidence that problems with inadequate administration of sodium thiopental or the inmate's level of consciousness occurred during Virginia's past lethal injections.

Plaintiff has failed to establish any likelihood that the harm he predicts will come to pass.  Both the expert testimony of Dr. Dershwitz and the testimony of numerous witnesses to Virginia's prior lethal injections establish to a near certainty that Plaintiff will experience nothing more than a loss of consciousness during his execution.[4] Plaintiff's failure to show a likelihood of irreparable harm precludes him from obtaining preliminary injunctive relief.  Accordingly, the Court will deny Plaintiff's request for a preliminary injunction.  Nevertheless, in light of the limited time before Plaintiff's execution, the Court will address the remaining factors of the preliminary injunction analysis for the benefit of any further appellate review.

### C.    Likely Harm To Plaintiff Balanced Against The Likely Harm To The State Defendants

It is well settled that the state has "a significant interest in meting out a sentence of

---

[4] Although Plaintiff's expert Dr. Stuart M. Lowson questions the accuracy of some of the conclusions of Dr. Dershwitz, Dr. Lowson can point to no specific evidence to support his perceived flaws in the Virginia process.

death in a timely fashion." *Nelson*, 541 U.S. at 644 (citing *Calderon v. Thompson*, 523 U.S. 538, 556–57 (1998); *In re Blodgett*, 502 U.S. 236, 238 (1992) (per curiam); *McCleskey v. Zant*, 499 U.S. 467, 491 (1991)).  "The state's interest in finality and in meting out a sentence of death in a timely manner acquires 'an added moral dimension' when the lengthy state and federal proceedings reviewing the conviction and sentence have run their course." *Reid*, 333 F. Supp. 2d at 552 (quoting *Calderon*, 523 U.S. at 556–57).  "At this point, the state and the victims of crime can expect the moral judgment of the state to be carried out without delay." *Id.* (citing *Calderon*, 523 U.S. at 556). "To unsettle these expectations is to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring), an interest shared by the State and the victims of crime alike." *Calderon*, 523 U.S. at 556.

Even if the Court were to assume that Plaintiff had demonstrated a sufficient likelihood of harm to satisfy the first factor, Plaintiff's "harm would be a thin shadow compared to the certain, profound and irreparable harm to the state if an injunction is issued.  Under such circumstances, [Plaintiff] must show a strong and significant likelihood of success on the merits." *Reid*, 333 F. Supp. 2d at 552.  As discussed below, Plaintiff's likelihood of success on the merits is negligible.

### D.     Likelihood Of Success On The Merits

Plaintiff's argument that he will likely prevail on the merits of his Eighth Amendment claim has little support in prevailing constitutional precedent.  Most of his

16

claims seek to import improved standards of medical care into the execution process. While reducing pain and discomfort are laudable goals, the Constitution does not require clinical precision or a surgical level of comfort in carrying out the death penalty.

For example, Plaintiff contends that the Eighth Amendment entitles him to executioners with the "training, qualifications, and experience that licensed medical practitioners possess." (Pl.'s Opening Br. 7.)  The Eighth Amendment prohibits indifference to substantial risks, it does not demand particular protocols or the employment of medical professionals.  *See Workman v. Bredesen*, No. 07-5562, 2007 WL 1311330, at *12 (6th Cir. May 7, 2007) ("[T]he Eighth Amendment [does not] require an anesthesiologist to be on hand to monitor the inmate's consciousness during every execution."); *Hamilton v. Jones*, 472 F.3d 814, 816 (10th Cir. 2007) ("[T]he Constitution does not require the use of execution procedures that may be medically optimal in other contexts."); *McKenzie v. Day*, 57 F.3d 1461, 1469 (9th Cir. 1995) ("[W]e are aware of no authority for the proposition that a prisoner is entitled, for example, to have a lethal injection administered by a physician."), *opinion adopted on reh'g en banc*, 57 F.3d 1493 (9th Cir. 1995).  Here, the record reflects that the execution team has extensive experience, training, and expertise in the pertinent medical fields.  History has proven it to be sufficient to address any complications that may arise during the lethal injection procedure.

Moreover, Plaintiff contends that additional steps must be taken to monitor his anesthetic depth.  Such demands are not linked to persuasive evidence reflecting that prior

17

Virginia inmates were, or future inmates will likely be, insufficiently sedated.  Rather,

Plaintiff's demands flow from his suggestion that accepted medical practices provide the

standard for evaluating a lethal injection procedure.  This assumption is incorrect.  *See*

*Workman*, 2007 WL 1311330, at *12 ("For exceedingly practical reasons, no state can

carry out an execution in the same manner that a hospital monitors an operation.");

*Walker v. Johnson*, 448 F. Supp. 2d at 723.  "An execution by lethal injection is not a

medical procedure and does not require the same standard of care as one."  *Walker*, 448

F. Supp. 2d at 723.  "[W]hile monitoring of anesthetization level is the optimal practice

appropriate for a surgical operating room," in light of the significant dose of sodium

thiopental used and the proven proficiency of Virginia's system, the Eighth Amendment

does not demand that Virginia employ additional measures to ensure the Plaintiff's

unconsciousness.[5]  *Hamilton*, 472 F.3d at 817 (concluding inmate was unlikely to prevail

on his claim that the Eighth Amendment demanded that Oklahoma make provisions for

monitoring inmate's anesthetization).  Nor does Plaintiff cite any persuasive authority for

his assertion that Virginia's protocol is somehow constitutionally deficient because a few

other states have chosen to adopt additional procedures or precautions.[6]

---

[5] As unpleasant as it may be to acknowledge, surgery and execution have the polar opposite medical objectives.

[6] For example, Plaintiff notes that New Jersey provides a means of resuscitating the prisoner if the execution is stayed by the Governor or the courts after it is commenced.  Therefore, Plaintiff asserts that it is "inexcusable" that Virginia fails to do so.  (Pl.'s Reply Br. 12.)  It must be noted that although New Jersey provides for lethal injection in theory, it has yet to conduct such a procedure.  Moreover, the record reflects

Measured against the actual demands of the Eighth Amendment, there is little

chance that Plaintiff will prevail on his constitutional claims.  In order to ultimately

demonstrate a violation of his rights under the Eighth Amendment, Plaintiff "must show

that there is a substantial risk that he will be subjected to an 'unnecessary and wanton

infliction of pain,' *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), 'contrary to contemporary

standards of decency, *Helling v. McKinney*, 509 U.S. 25, 36 (1993).'"  *Reid*, 333 F. Supp.

2d 553; *see Walker*, 448 F. Supp. 2d at 722.[7]

"Traditional deaths by execution, such as by hanging, have always involved the

possibility of pain and terror for the convicted person."  *Gray v. Lucas*, 710 F.2d 1048,

1061 (5th Cir. 1983) (rejecting claim that death by cyanide gas, which could last seven

minutes and be extremely painful, violated the Eighth Amendment); *see also Campbell v.

Wood*, 18 F.3d 662, 683–87 (9th Cir. 1994) (holding that death by hanging is not cruel

and unusual even if it involved some pain).  As was the case with prior lethal injection

---

that, in Virginia, there is no need to anticipate such post-execution stays because the
execution does not commence until the Warden receives specific authority to do so from
the Governor's office.  Finally, there is no record of any such post-execution stay ever
having occurred in Virginia.

[7] Plaintiff asserts that the Eighth Amendment prohibits methods of execution that
"involve the unnecessary and wanton infliction of pain."  *Gregg v. Georgia*, 428 U.S.
153, 173 (1976).   This Court agrees in the abstract, but the teachings of *Gregg* must be
applied in context when interpreting Eighth Amendment law.  *See Wilson*, 501 U.S. at
303 (concluding wantonness requires the inmate to demonstrate deliberate indifference);
*Farmer v. Brennan*, 511 U.S. 825, 844–47 (1994) (concluding deliberate indifference
requires the inmate to demonstrate prison officials disregarded a substantial risk of
serious harm); *see also Woods v. Buss*, No. 07-2001, 2007 WL 1302119, at *2 (7th Cir.
May 3, 2007).

challenges addressed by this Court, Plaintiff's "claim that his rights will be violated focuses on what may go wrong.  However, . . . '[t]he risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review.'" *Reid*, 333 F. Supp. 2d at 553 (quoting *Campbell v. Wood,* 18 F.3d 662, 687 (9th Cir. 1994)). Moreover, the record reflects that Defendants have gone to great lengths to anticipate and minimize the risk of error in an execution by lethal injection.

When an inmate receives two grams of sodium thiopental, his chance of suffering any significant pain associated with his execution is so remote as to be nonexistent.  *See Reid*, 333 F. Supp. 2d at 551.  Thus, essential to Plaintiff's Eighth Amendment claim is evidence indicating that there is a substantial risk that the sodium thiopental will not be delivered in the quantity prescribed by the protocol or in sufficient quantities to render him unconscious.  On that critical fact, the records and the testimony of the witnesses uniformly reflect that for Plaintiff, as was the case for all previously executed inmates, the appropriate dose of sodium thiopental will be properly administered and that he will be sufficiently anesthetized to tolerate the pancuronium bromide phase.

Plaintiff cannot defeat the foregoing conclusion by simply pointing to isolated discrepancies between the published protocol and the accounts of execution team members regarding the administration of a second dose of pancuronium bromide and potassium chloride.  Such discrepancies, to the extent they have any bearing on the current inquiry, dispel rather than establish Plaintiff's Eighth Amendment claim.  For example, Plaintiff argues that under the protocol the execution team should only

20

administer a second set of pancuronium bromide and potassium chloride if the heart monitor does not indicate a flat line reading ten minutes after the administration of the first set of chemicals. Plaintiff then notes that Defendants have at times deviated from this requirement and administered the second set of pancuronium bromide and/or potassium chloride before the ten minute mark. Contrary to Plaintiff's suggestion, such deviation does not reflect carelessness or confusion. Rather, it is indicative of Defendants' attentiveness and willingness to ensure that those executions did not involve "torture or a lingering death." *In re Kemmler*, 136 U.S. 436, 447 (1890); *see Walker*, 448 F. Supp. 2d at 722–24.

Thus, the Court finds that there is no likelihood that Plaintiff will prevail on the merits of his Eighth Amendment claim. Further weighing against Plaintiff under this factor of the balancing test, is the substantial possibility that Plaintiff would be precluded from even litigating the merits of lethal injection claim because, by default, he selected that method of execution over the constitutional alternative of electrocution. *See Reid*, 333 F. Supp. 2d at 552 (citing *Stewart v. LaGrand,* 526 U.S. 115, 119 (1999); *Orbe v. Johnson,* 267 Va. 568, 601 S.E.2d 543 (2004)). Furthermore, Plaintiff could not litigate any claim related to the merits of execution by electrocution because he has failed to exhaust his administrative remedies for such a claim. *See* 42 U.S.C. § 1997e(a).

### E.    Public Interest and Equitable Principles

For much the same reasons discussed in *Reid,* the public interest in denying preliminary injunctive relief and a consequent stay rests firmly on the side of

Defendants.[8]  *See Reid*, 333 F. Supp. 2d at 553.  Additionally, the Court must consider the

timing and nature of Plaintiff's request under general equitable principles.  *Nelson*, 541

U.S. at 649–50.  In this respect, the Supreme Court has emphasized that, "there is a strong

equitable presumption against the grant of a stay where a claim could have been brought

at such a time as to allow consideration of the merits without requiring entry of a stay."

*Id*. at 650.

Plaintiff could have and should have brought this claim years ago.  *See Lenz v.

Johnson*, 443 F. Supp. 2d 785, 793 (E.D. Va. 2006); *Reid*, 333 F. Supp. 2d at 553–54.

Nevertheless, Plaintiff waited until less than two months before his execution to file his

present complaint.  As this Court previously noted, such a period between the filing of a

complaint and a scheduled execution is insufficient time to conduct a trial on the merits

without entering a stay.[9]  *See Jones v. Allen*, No. 07-11840, 2007 WL 1225393, at *3–4

(11th Cir. Apr. 27, 2007), *cert. denied,* 127 S. Ct. 2160 (May 3, 2007); *Harris v. Johnson,*

376 F.3d 414, 417 (5th Cir. 2004) ; *see also Workman v. Bredesen*, No.07-5562, 2007

WL 1311330 at *13 (6th Cir. May 7, 2007).  Plaintiff's delay in this matter is a significant

factor in and of itself, sufficient to foreclose any claim to equity.  *See Gomez v. U.S. Dist.*

---

[8] "Emmet has not sought a stay of execution, and is proceeding on a motion for preliminary injunction at the Court's insistence and under protest." (Pl.'s Reply Br. 13 n.8.)  It is inevitable, however, that a stay would result if this Court were to review his claim on the merits.

[9] Plaintiff's counsel advised the Court of their desire for a hearing on the merits approximately 35 days before his scheduled execution.

*Court for the N. Dist. of Cal.*, 503 U.S. 653, 654 (1992).

### III.  CONCLUSION

Each of the factors the Court must consider in granting preliminary injunctive relief weigh decidedly and firmly against Plaintiff:  the potential for Plaintiff to experience any harm is negligible; the harm to the state if an injunction is issued is severe; Plaintiff is highly unlikely to succeed on his underlying claim; and his inexcusable delay forecloses equitable remedies.  Plaintiff's motion for a preliminary injunction will be denied.

An appropriate Order will accompany this Memorandum Opinion.

_____/s/_____

Henry E. Hudson
United States District Judge

ENTERED this <u>1st</u> day of <u>June</u> 2007.
Richmond, VA

24