IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| CHRISTOPHER SCOTT EMMETT, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 3:07CV227–HEH |
| ) | |
| GENE M. JOHNSON, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Plaintiff, Christopher Scott Emmett, a Virginia state inmate sentenced to death, brings this civil rights action under 42 U.S.C. § 1983. The Complaint seeks equitable and injunctive relief for alleged violations, threatened violations, or anticipated violations of Plaintiff's right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The matter is before the Court on Defendants' Motion for Summary Judgment and Plaintiff's response thereto. Because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid in the decisional process, the Court will dispense with oral argument.

Plaintiff does not challenge the constitutionality of his state capital murder conviction or his death sentence. They have been exhaustively reviewed and upheld. *See Emmett v. Commonwealth*, 264 Va. 364, 569 S.E.2d 39 (2002). This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is to be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact involves "disputes over facts that might affect the outcome of the suit under the governing law," not "[f]actual disputes that are irrelevant and unnecessary." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324, 106 S. Ct. at 2553 (internal quotation marks omitted). When the motion for summary judgment is properly supported, the nonmoving party must then go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting* Fed. R. Civ. P. 56(c) and 56(e)). When reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the

nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (*citing Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513). Nevertheless, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2511 (internal citations omitted).

The parties have submitted affidavits, depositions, execution records, and other materials in response to the pending motion for summary judgment. Although a number of peripheral facts are disputed, e.g., sufficiency of formal medical training, lack of adequate physician oversight and inconsistent application of protocols, none are material to the core elements of Plaintiff's constitutional claims. Accordingly, the following facts are accepted as true for purposes of the motion for summary judgment. Additional facts will be set forth in conjunction with a discussion of the Plaintiff's specific arguments that the Defendants' lethal injection procedures are unconstitutional.

## II. SUMMARY OF FACTS

Even though Plaintiff challenges only certain aspects of the chemical protocol used to carry out execution by lethal injection, an understanding of all its components and the methodology employed in their application is important to a full appreciation of those elements at issue. The process entails the sequential introduction of three chemicals. All chemicals used in the process are remotely introduced by pre-established intravenous ("IV") lines. The constituent injections are administered by an execution team. The execution team is comprised of a team leader, who actually administers the various

chemicals; the IV team, which is responsible for placement of the IV lines;[1] and the security team, which is responsible for security.

The entire process takes place in a one-room chamber. The inmate is strapped to a gurney in the front portion of the chamber, while the team leader, the IV team, and the physician who pronounces death are positioned a few feet away, behind a curtain in the rear of the chamber. The curtain has a window to enable the team leader to observe the administration of the chemicals. The curtain also has two portals through which the IV lines pass.[2] The current team leader prefers to observe the administration of the chemicals through one of the portals because he finds his field of vision less obstructed than that through the window.

Initially, two grams of sodium thiopental, a barbiturate that induces unconsciousness, are administered. The intravenous line is then flushed with a saline solution, which ensures that the full dose of sodium thiopental is delivered. The saline flush also eliminates the possibility of an interaction between sodium thiopental and the second-stage drug, pancuronium bromide. Any such interaction outside of the body could significantly hinder the effectiveness of the sodium thiopental.

After this flushing procedure, pancuronium bromide, a neuromuscular blocking

---

[1] As used in this Memorandum Opinion, placing of IV lines includes the acts of accessing the inmate's veins and setting up the pertinent IV equipment.

[2] Virginia routinely places two IV lines on the condemned inmate so that members of the execution team can quickly switch to the secondary line if there is difficulty with the primary line.

agent which causes paralysis in all muscles except the heart, is administered by IV.[3] Pancuronium bromide suppresses involuntary seizures or motor manifestations that may occur during the execution process. The 50 mg quantity of pancuronium bromide administered during this stage is sufficient to cause the inmate to suffocate. Next, saline solution is again introduced to flush the line.

The final phase involves the introduction of 240 milliequivalents of potassium chloride, which causes cardiac arrest. Generally, within moments after the potassium chloride has been injected, the inmate's heart will stop beating. Shortly thereafter, brain activity will cease. A physician monitors the inmate's heartbeat and pronounces death. Virginia's lethal injection protocols provide that, "[i]f the heart monitor does not indicate a flat line reading within ten minutes after completing the first set of lethal chemicals, then a second set of lethal chemicals will be administered (Pavulon and Potassium Chloride only), using the alternate IV line." (Docket No. 16 at 25.)

When the chemicals are properly administered, the chance of an inmate feeling any pain associated with his execution is less than 3/100 of one percent (.03%).[4] Plaintiff has

---

[3] The brand name for this chemical is Pavulon.

[4] Both sides presented expert deposition testimony on the pharmacological effects of the chemicals administered. Plaintiff offered Dr. Stuart M. Lowson, a doctor of internal medicine and anesthesiology who also teaches anesthesiology; the defense presented Dr. Mark Dershwitz, an M.D. with a Ph.D. in pharmacology who works as an anesthesiologist, teaches anesthesiology, biochemistry, and molecular pharmacology, and conducts research in pharmacokinetics. Although Dr. Lowson questioned Dr. Dershwitz's confidence in the ability of prison staff to competently administer the drugs, he offered no plausible basis for challenging Dr. Dershwitz's prediction regarding the effect of the drugs if administered properly.

not adduced any evidence that suggests his particular physical characteristics are likely to increase that risk.

Plaintiff maintains that if an inmate receives less than a full dose of sodium thiopental, it is possible that he may appear to be asleep while still retaining a level of consciousness sufficient to experience some pain. (Pl.'s Opp. to Defs.' Mot. Summ. J. Ex. WW.) Additionally, if an inmate received as little as twenty percent of the intended dose of pancuronium bromide, he could be paralyzed and unable to communicate whether he is experiencing pain. (Pl.'s Opp. to Defs.' Mot. Summ. J. Ex. WW.) However, the fact that the same IV tube is ordinarily used to deliver all the drugs minimizes the risk that an inmate would not receive the beneficial effects of sodium thiopental, but would nevertheless experience any pain associated with the subsequently administered pancuronium bromide and potassium chloride.

While Plaintiff does present evidence that warrants some concern with aspects of Virginia's execution procedures, none rise to the level of an Eighth Amendment violation. For example, Plaintiff argues that the required training plan for members of the execution team has in fact never been created, and that the logs documenting training sessions for the IV team members contain large gaps, sometimes spanning months, in which no training has occurred. Plaintiff also presents evidence of ten executions in which second doses of pancuronium bromide and/or potassium chloride were administered and points out inconsistencies in the execution team members' understanding of the documented

protocols for administering these second doses.

Despite Plaintiff's concerns, Virginia has taken considerable precautions to ensure that neither human error nor defective equipment increase the risk that Plaintiff will feel any pain. In this regard, Virginia has promulgated execution protocols that provide comprehensive instructions for carrying out an execution. In addition to specifying the procedures, the equipment, and the chemicals to be used in an execution by lethal injection, the protocols also cover the training and qualifications of the execution team. Defendants have supplemented the protocols with numerous additional unwritten safety measures that reduce the risk an inmate will experience pain during his execution. The Virginia Department of Corrections has taken significant steps to ensure the professionalism of the execution team.

There is no evidence that improper placement or flow of IV lines has resulted in a painful death for any individual previously executed in Virginia. Virginia undoubtably takes considerable precautions to ensure that the IV lines are properly placed and functioning. For example, in order to ensure that the IV lines are properly installed, the protocol requires that the members of the IV team have significant pertinent medically related experience. Currently, the lead member of the IV team, who will participate in Plaintiff's execution, has twenty years of hands-on medically related experience, which includes mixing medications and inserting and maintaining IV lines. This IV team member has also been an emergency medical technician and participated in a dozen

executions. The second IV team member is a certified phlebotomist. Additionally, Defendants have retained a physician to train new members of the IV team. All new members of the IV team receive twenty hours of training with the physician prior to being permitted to participate in an execution. On occasion, the physician has attended executions for the purpose of assessing what additional training may be helpful to the IV team. The physician has not observed any members of the IV team making a mistake during an execution and has noted that they are proficient in performing their tasks.

Defendants also have taken precautions against any risk that the IV lines will not flow smoothly. For example, after placing the IV lines, but prior to administering the lethal chemicals, the IV team tests the lines using saline solution. The IV team also ensures that the restraints on the inmate are not impeding the flow in the IV lines. Additionally, during the execution, the team leader continuously observes the inmate and the IV lines to ensure that the drugs are reaching the inmate in the proper manner.

All members of the execution team participate in eight hours of thorough, intensive training per month. During the monthly training, the team members run through numerous simulated executions wherein they prepare for a variety of contingencies, from unruly inmates to improperly flowing IV lines. The physician also regularly trains with members of the IV team to assure their continued proficiency in placing the IV lines.

## III. ANALYSIS

The permissible scope of a constitutional challenge to execution procedures brought under 42 U.S.C. § 1983 is narrow. A civil rights action is not an appropriate vehicle to contest either an inmate's sentence of death or the constitutionality of the death penalty generally. In this case, Plaintiff does neither. The United States Supreme Court has held that the boundaries of civil rights litigation in this context are wide enough to encompass medical procedures incident to the execution process and the chemical formula used in carrying out the lethal injection. *See Hill v. McDonough*, 126 S. Ct. 2096, 2101-04 (2006); *Nelson v. Campbell*, 541 U.S. 637, 647-48, 124 S. Ct. 2117, 2124-25 (2004). Thus, those aspects of Plaintiff's claim that fall within the ambit of the Eighth Amendment are properly before the Court. In reviewing Plaintiff's claims, however, the Court must be mindful that it is not the office of a federal court to dictate to the Commonwealth of Virginia the precise methodology it should employ in carrying out a lawful death sentence, as long as the procedure is constitutionally sound and does not subject the inmate to cruel and unusual punishment. Whether or not the procedure used should conform to prevailing medical standards of care, or whether there is a more humane execution procedure, is a decision to be made by the Virginia General Assembly and not this Court.

### A. Plaintiff's Burden Under the Eighth Amendment

In order to survive summary judgment, Plaintiff must submit evidence from which a reasonable finder of fact could conclude that Plaintiff will be subjected to an "unnecessary and wanton infliction of pain," *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991), "contrary to contemporary standards of decency." *Helling v. McKinney*, 509 U.S. 25, 32, 113 S. Ct. 2475, 2480 (1993) (*citing Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976)); *see Walker v. Johnson*, 448 F. Supp. 2d 719, 722 (E.D. Va. 2006) (*citing Nelson*, 541 U.S. at 643-44, 124 S. Ct. at 2122-23). "At some level, every execution procedure ever used contains risk that the individual's death will not be entirely pain free." *Workman v. Bredesen*, 486 F.3d 896, 908 (6th Cir.) (citing cases), *cert. denied*, 127 S. Ct. 2160 (2007); *see Campbell v. Wood*, 18 F.3d 662, 683-87 (9th Cir. 1994) (holding that death by hanging is not cruel and unusual even if it involved some pain); *Gray v. Lucas*, 710 F.2d 1048, 1061 (5th Cir. 1983) (rejecting claim that cyanide gas execution procedure, which could last seven minutes and be extremely painful, violated the Eighth Amendment).

In the present context, Plaintiff must demonstrate that the unnecessary pain he will experience "satisfies the Eighth Amendment's objective component for inmates challenging their conditions of confinement or medical care." *Reid v. Johnson*, 333 F. Supp. 2d 543, 551 (E.D. Va. 2004) (*citing Nelson*, 541 U.S. at 644-45, 124 S. Ct. at 2123). Furthermore, he must demonstrate that the attendant risk of experiencing severe

pain is substantial. *See Reid*, 333 F. Supp. 2d at 553.[5] Therefore, Plaintiff must identify specific evidence and "articulate the precise manner in which that evidence," *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (internal quotation marks omitted), supports a finding that there is a substantial risk that he will experience unnecessary pain that "is 'serious' or 'significant.'" *Reid*, 333 F. Supp. 2d at 551 (*quoting Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)).

Plaintiff's own expert conceded that, "[b]ased on my clinical experience, it seems likely that if 2 grams of sodium thiopental is successfully delivered into the circulation of inmates of average size, the inmate will be sufficiently anesthetized at the time the pancuronium bromide and potassium chloride are administered." (Lowson Rebuttal Aff. ¶ 1 (Docket No. 33).) Thus, Plaintiff's primary argument "focuses on the fact that there is substantial risk that he will not receive the intended dose of anesthesia and may be able to experience the pain associated with the second and third chemicals." (Pl.'s Opp. to Defs.' Mot. Summ. J. at 8.) This argument is premised on complications in the lethal injection process encountered in other jurisdictions or which *could* conceivably occur in Virginia.

---

[5] Plaintiff asserts that the Eighth Amendment prohibits methods of execution that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 2925 (1976) (citing cases). The Court does not disagree. The test set forth by the Court merely gives effect to what these terms require of Plaintiff in the present context. Wantonness requires the inmate to demonstrate deliberate indifference. *See Wilson*, 501 U.S. at 303, 111 S. Ct. at 2326-27. Deliberate indifference requires the inmate to demonstrate that prison officials disregarded a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 844-47, 114 S. Ct. 1970, 1982-84 (1994); *see also Woods v. Buss*, __ F.3d __, No. 07-2001, 2007 WL 1302119, at *2 (7th Cir. May 3, 2007).

11

In response to the motion for summary judgment, Plaintiff raised a secondary theory. He maintains that even if the full dose of sodium thiopental is successfully delivered into his circulation, he is at grave risk of injury if the Defendants do not allow a sufficient interval before administering the second and third chemicals. The Court will address these issues in inverse order.

**B.     Risk of Unnecessary and Significant Pain from the Expeditious Administration of the Chemicals**

To support his theory that Defendants must allow a specific time lapse to enable the sodium thiopental to take effect, Plaintiff relies on the testimony of a Dr. Thomas Henthorn from a hearing conducted in *Taylor v. Crawford*, Case No. 05-4173-CV-S-FJG (W.D. Mo. June 12, 2006), concerning Missouri's lethal injection procedure. (Pl.'s Opp. to Defs.' Mot. Summ. J. Ex. BBB.) Dr. Henthorn opined that the appropriate depth of unconsciousness for administering lethal injection is referred to as "burst suppression," a depth of unconscious that is far in excess of that which is required for surgery. (Pl.'s Opp. to Defs.' Mot. Summ. J. Ex. BBB at 82-83); *see Taylor v. Crawford*, 487 F.3d 1072, 1076-77 (8th Cir.), *petition for cert. filed* (U.S. Sept. 5, 2007) (No. 07-303). Dr. Henthorn explains that it takes longer to achieve burst suppression than to reach the lesser depth of unconscious necessary for surgery. Therefore, Dr. Henthorn concludes that unless there is a sufficient delay before the administration of the second and third chemicals, there is a possibility that the inmate will feel some pain associated with the pancuronium bromide and potassium chloride.

12

The flaw in Plaintiff's proffered evidence is that it fails to quantify the likelihood of that possibility occurring even under Missouri's lethal injection procedures. More importantly, Dr. Henthorn's opinion is without factual context and is therefore of little probative value in assessing the likelihood that Plaintiff will experience such a theoretical reaction. Such hypothetical evidence, even if admissible, is insufficient to counter the testimony of Dr. Dershwitz that the Plaintiff's risk of pain is less than 3/100 of one percent (.03%), a risk that is not constitutionally significant.[6]

### C. Risk that the Full Dose of Sodium Thiopental Would Not Be Successfully Administered

On another front, Plaintiff contends that inadequate procedures and insufficiently trained personnel create a substantial risk that the sodium thiopental will not be successfully delivered into his circulatory system. Plaintiff adds that such concerns are substantiated by Virginia's history of flawed executions.

In an expansive interpretation of Eighth Amendment jurisprudence, Plaintiff maintains that he is constitutionally entitled to executioners with the "training, qualifications, and experience that licensed medical practitioners possess." (Pl.'s Opening Br. at 7.) The Eighth Amendment prohibits indifference to substantial risks, but this does not equate to the prevailing standard of medical care, or require the intervention

---

[6] Plaintiff also fails to explain why any risk associated with the expeditious introduction of the chemicals is not an inherent risk in a lethal injection procedure. Plaintiff's own expert warned that, "[i]f there is a delay in the administration of the chemical agents necessary for lethal injection . . . there is a risk that the anesthetic effects of the sodium thiopental may wear off." (Aff. Dr. Lowson ¶ 15 (Docket No. 31).)

of medical professionals. *See Workman v. Bredesen*, 486 F.3d 897, 910 (6th Cir.) (concluding that the Eighth Amendment does not "require an anesthesiologist to be on hand to monitor the inmate's consciousness during every execution"), *cert. denied*, 127 S. Ct. 2160 (2007); *Hamilton v. Jones*, 472 F.3d 814, 816 (10th Cir.) ("[T]he Constitution does not require the use of execution procedures that may be medically optimal in other contexts."), *cert. denied*, 127 S. Ct. 1054 (2007); *McKenzie v. Day*, 57 F.3d 1461, 1469 (9th Cir.) ("[W]e are aware of no authority for the proposition that a prisoner is entitled, for example, to have a lethal injection administered by a physician."), *opinion adopted on reh'g en banc*, 57 F.3d 1493 (9th Cir. 1995)). Here, the record fails to demonstrate that the execution team's experience, training, and expertise are less than adequate to address any complications that may arise during the course of the lethal injection procedure.[7]

Plaintiff's assertions that the complexities of the lethal injection process exceed the capabilities of the execution team are not borne out by the evidence. For example, Plaintiff posits that the lack of adequate protocols and expertise might lead the execution team to improperly mix the ingredients of the liquid compound sodium thiopental, which is obtained in powder form from a licensed pharmacist. The package containing the sodium thiopental includes explicit mixing instructions. The prepackaged ingredients are simply combined in their entirety. This process does not appear to require any specialized

---

[7] While the Court ultimately concludes that the procedures adopted by the Virginia Department of Corrections are constitutionally adequate, the inconsistencies demonstrated by the evidence are disturbing and may warrant administrative review.

skills. This straightforward task is well within the competence of the IV team members and there is no evidence of any reasonably foreseeable risk of error.

Additionally, Plaintiff argues that the Eighth Amendment demands that Defendants take additional steps to monitor his level of anesthesia to ensure that he has reached a clinically acceptable depth of unconsciousness. Again, this position lacks legal moorings. First, there is no persuasive evidence that prior Virginia inmates have experienced an insufficient depth of anesthesia. To conclude that Plaintiff *might* be so shallowly sedated as to experience severe pain would be both speculative and contrary to the uncontroverted testimony of Dr. Dershwitz.

Secondly, there is no legal support for Plaintiff's contention that medical norms provide the baseline for evaluating lethal injection procedures in the execution setting. *See Workman*, 486 F.3d at 910 ("For exceedingly practical reasons, no state can carry out an execution in the same manner that a hospital monitors an operation."). "An execution by lethal injection is not a medical procedure and does not require the same standard of care as one." *Walker v. Johnson*, 448 F.3d 719, 723 (E.D. Va. 2006). Admittedly "monitoring of anesthetization level is the optimal practice appropriate for a surgical operating room," but such measures have never been mandated by the Eighth Amendment. The significant dose of sodium thiopental administered, coupled with the practices and procedures adopted by the Virginia Department of Corrections, is more than sufficient to ensure Plaintiff's unconsciousness. *Hamilton*, 472 F.3d at 817 (concluding

inmate was unlikely to prevail on his claim that the Eighth Amendment demanded that Oklahoma make provisions for monitoring inmate's anesthetization).[8] Plaintiff's analogy to clinical medical standards in evaluating the methods used for conducting executions is without constitutional basis. As this Court has previously noted, surgery and execution have the polar opposite medical objectives.

Plaintiff persists that Defendants are not entitled to summary judgment in light of the evidence of perceived complications in prior executions, arguable differences of opinion in interpreting aspects of the protocol, and what he describes as "botched executions." Such evidence is insufficient to defeat the motion for summary judgment unless Plaintiff can demonstrate some likelihood of a substantial risk that *he* will suffer significant pain during his execution. For example, Plaintiff points to documentary evidence that there is often a significant delay between the time the inmate is positioned on the execution table and the administration of the sodium thiopental. Plaintiff fails to show how this lapse of time poses a substantial risk that he will not be properly anesthetized. Historical evidence reflects that, prior to the administration of the lethal chemicals, the IV team has always successfully placed one or more IV lines.

---

[8] Plaintiff's other arguments are equally unavailing. For example, Plaintiff notes that New Jersey provides a means of resuscitating the prisoner in the case where the execution is stayed by the Governor or the courts after it is commenced. The record reflects that, in Virginia, there is no need to anticipate such post-execution stays because the execution does not commence until the warden confirms with the Governor's office the propriety of going forward with the execution. Furthermore, there is no record of any such post-execution stay ever having occurred in Virginia.

Similarly immaterial to the present summary judgment analysis is the evidence of discrepancies between the published protocol and the accounts of prison officials regarding the administration of a second dose of pancuronium bromide and potassium chloride. Viewed in the light most favorable to Plaintiff, these differences in recollection and viewpoint add little substantive proof of any substantial risk of harm. "[M]ere speculation or the building of one inference upon another" is insufficient to overcome summary judgment. *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

As further evidence of the potential for pain and suffering, Plaintiff draws the Court's attention to the last execution to take place in Virginia, that of John Yancey Schmitt. Plaintiff relies on the fact that Schmitt was not pronounced dead until thirteen minutes after the administration of the sodium thiopental. Plaintiff's expert suggests that this lapse of time "raises the *possibility* that the drugs were not properly administered or did not reach their site of action in the heart." (Lowson Aff. ¶ 21 (Docket No. 31) (emphasis supplied).) Plaintiff then builds upon Lowson's conjecture and speculates that Schmitt was conscious, but could not express any pain because of the paralyzing effect of the pancuronium bromide. Plaintiff has offered no admissible evidence to support his conclusion that only the pancuronium bromide was effectively delivered into Schmitt's system from the first round of injections.[9]

---

[9] Plaintiff cannot transform his conjecture into admissible evidence simply by citing an inadmissible medical article. *See Moore v. Matthews*, 445 F. Supp. 2d 516, 528-29 (D. Md. 2006). While the Court denied Defendants' motion to strike from the record Plaintiff's Exhibits AAA and BBB, the Court finds the Defendants' arguments regarding inadmissibility of these

17

A close examination of accounts from eyewitnesses to Schmitt's execution refutes Plaintiff's speculative theory that he was not fully anesthetized because less than the full dose of sodium thiopental was delivered into his veins.[10] The observing physician, who was present throughout the process, confirms that the IV team placed the lines properly. The execution team leader is steadfast that the IV lines flowed smoothly and without leaks, and that there was no swelling around the IV site. The only sound that emanated from Schmitt was snoring, which is consistent with the proper administration of the sodium thiopental. The circumstances of Schmitt's execution provide minimal support for Plaintiff's constitutional claims. Despite conscious efforts to carry out a sentence of death humanely, the process will never advance to a level of scientific precision. Plaintiff has capably highlighted the risks inherent in the lethal injection process. Indeed, similar risks are present to a lesser degree in even the most technologically advanced surgical settings. To support an Eighth Amendment claim, Plaintiff must go further than merely demonstrating risks. He must show a substantial risk that is reasonably foreseeable.

---

exhibits to be well taken.

[10] Virginia uses the onset of a flat line electrocardiogram ("ECG") as indicative of the death of an inmate. Defendants' expert, Dr. Dershwitz, examined the ECG graph made contemporaneously with Schmitt's execution. Dr. Dershwitz concluded the ECG readings are consistent with the drugs being administered through a working vein. Dr. Dershwitz suggests that "[a] possible, and certainly plausible, explanation for the length of time required to observe a flat line ECG during [Schmitt's] execution is that once a fraction of the entire 240mEq dose of potassium chloride reached the heart, the electrical pattern changed (as displayed by the ECG) and the mechanical activity of the heart (i.e. pumping) was impaired to the point that the remaining portion of the administered dose of potassium chloride was not delivered to the heart." (Dershwitz Rebuttal Aff. ¶ 2 (Docket No. 35).)

*Strickler v. Waters*, 989 F.2d at 1381.

## IV. CONCLUSION

In the final analysis, Plaintiff's claim hinges on the possibility that something may go wrong during the execution procedure, namely the risk that due to human error or accident, the proper dose of sodium thiopental may not be delivered into his circulatory system. Nowhere in the jurisprudence of capital punishment has the inability to eliminate such risk been found to offend contemporary standards of decency. To pass constitutional review, all the Commonwealth of Virginia need do is take reasonable precautionary steps. *See Reid v. Johnson*, 333 F. Supp. 2d 543, 553 (E.D. Va. 2004) (*quoting Campbell v. Wood*, 18 F.3d 662, 687 (9th Cir. 1994)). This Court finds that they have done so. Accordingly, Defendants' motion for summary judgment (Docket No. 40) will be granted.[11] The action will be dismissed.

An appropriate Order will accompany this Memorandum Opinion.

                                                  /s/
                                               Henry E. Hudson
                                               United States District Judge

Date: Sept. 20, 2007
Richmond, Virginia

---

[11] In light of the Court's conclusion regarding the merits of Plaintiff's claims, the Court declines to address Defendants' procedural arguments for summary judgment.